## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JOHN EDWARD BOWKER,

     Plaintiff,

    v.                                 Civ. No. 24-1174 MIS/KK

FRANK BISIGNANO, Commissioner
of the Social Security Administration,

     Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

Before the Court is Plaintiff John Edward Bowker's ("Claimant") Motion to Reverse and Remand to Agency with Supporting Memorandum (Doc. 16) ("Motion"), filed March 17, 2025, in which Claimant appeals the denial of his claim for Supplemental Security Income ("SSI") and asks the Court to remand this matter to the Social Security Administration for further proceedings. (*Id.* at 2.) On April 29, 2025, the Commissioner filed a response to Claimant's Motion, and on May 27, 2025, Claimant filed a reply in support of it. (Docs. 19, 22.)

Having meticulously reviewed the entire record and the relevant law, being otherwise sufficiently advised, and for the reasons set forth below, I propose to find that Claimant's Motion is well-taken. I therefore recommend that the Court GRANT the Motion, reverse the Commissioner's decision denying SSI, and remand this matter to the Commissioner for further proceedings consistent with the recommendations contained herein.

---

[1] By an Order of Reference (Doc. 10) entered on December 4, 2024, United States District Judge Margaret I. Strickland referred this case to me to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.

## Factual and Procedural History

Claimant is a forty-three-year-old man who suffers from bipolar disorder, borderline personality disorder, panic disorder, generalized anxiety disorder, post-traumatic stress disorder ("PTSD"), a learning disorder, obsessive-compulsive disorder ("OCD"), and a disorder of the right ankle. (*See* AR 20.)[2] Additionally, he was diagnosed with human immunodeficiency virus ("HIV") in 2004. (*See* AR 20, 435, 438.) However, his viral load has been mostly undetectable since his HIV diagnosis. (AR 20, 575, 600, 784, 790.) Claimant alleges that as a child he was sexually abused by his father and a former babysitter. (AR 708, 807, 1001.) He is also a former methamphetamine user. (AR 808, 1002.) Claimant previously received Disability Insurance Benefits, but these were discontinued in 2018 after he began serving a five-year prison sentence for convictions for aggravated identity theft, mail theft, possession of stolen mail, bank fraud, and possession of methamphetamine. (AR 1001–01.) He was released from prison in 2021 and moved into a halfway house. (AR 1001, 1094.) In November 2022, he moved in "with [his] mom in the mother-in-law quarters of his brother and sister in law's home," in Moriarty, New Mexico, where he currently resides. (AR 1000.)

Claimant received his GED in 1998 and has taken some college courses. (AR 26, 312, 616, 618, 627, 632.) In January 2022, Claimant began working part-time as a cook and dishwasher at Twisters, a local New Mexican fast-food chain. (AR 319-320.) At Twisters, he would usually work three to five days a week for three to four hours each day. (AR 320.) However, Claimant testified that he was fired from this job after six months partly because, due to his anxiety and bipolar

---

[2] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on January 15, 2025. (Doc. 11.)

disorder, he "called in quite a few days there."[3] (AR 57.) According to a letter written by Claimant's shift manager at Twister's, Claimant would frequently "mess[] up orders and got overly frustrated with it and would have to go out and smoke cigarettes." (AR 409.) After being fired from Twisters, Claimant began working part time as a delivery driver at a Domino's Pizza restaurant in October 2022. (AR 319). Similar to his schedule at Twisters, Claimant worked two to five days per week for approximately four hours each day. (AR 321.) However, at a mental status examination Claimant attended on December 17, 2022, he reported that he left his job at Domino's because he was "unable to manage the stress of a regular job." (AR 1000–01.)

Following his departure from Domino's, Claimant began working part-time for Advanced Concept Construction, a commercial and residential property maintenance company that his mother owns and operates out of the home she shares with Claimant and her other son Kurt. (AR 64–68.) Regarding Claimant's job duties with her company, Claimant's mother testified that

> [h]e fills in running errands, picking up something for us that we need picked up. He sits down and balances a checkbook for us or a credit card statement for us. He helps me find things on the internet if I'm looking for a particular product. And then he helps out—he helps me out because I have a responsibility to help out with the children.[4]

(AR 67.) She added that Claimant's work schedule with her company "really varies. Some weeks it might be 20 hours. Some weeks it might be 15—maybe 15 hours every week." (AR 68.) Concerning accommodations Claimant receives while working for her company, his mother explained:

> Like when he's—well, an example, when he's balancing a checkbook. Maybe that entry hasn't been previously made. And so he needs to know what's it for. And I would expect another employee to, you know, tell them once, and they remember

---

[3] Claimant also reported that he was fired from this job for getting into "a fight with his supervisor." (AR 916.)

[4] As part of his work for his mother's company, Claimant helps his mother watch his brother Kurt's twin children at his mother's home office. (AR 48-49, 68-69.)

3

it. But John, I may have to remind him several times. You know, something from Bob Garrecht Supply is a plumbing product. Someone else, I would expect them to know that. But, John, I may have to remind him a few times.

(AR 69.) She added that he also makes mistakes in QuickBooks that she has to fix. (AR 70.) She reported that she could use someone who could work more hours, but she prefers to have Claimant work with her because he is her son. (AR 69.)

On April 14, 2022, Claimant, then age thirty-nine, protectively filed an application for SSI, alleging an onset date of September 1, 2018. (*See* AR 223–25.) A day later, he filed a signed application for SSI, alleging an onset date of August 2018. (AR 227–36.) In his signed application, he indicated he could no longer work due to a traumatic brain injury ("TBI"),[5] bipolar disorder, OCD, PTSD, general anxiety, HIV, tendinitis in his right ankle, and an unspecified ankle condition. (AR 228.)

Claimant's claims were denied at the initial level on January 10, 2023 (AR 122–25), and at the reconsideration level on September 20, 2023. (AR 136–38.) Claimant requested a hearing on November 16, 2023, (AR 143), and Administrative Law Judge ("ALJ") Michael Sauve conducted a hearing on May 23, 2024. (AR 40-82.) During the hearing, the ALJ heard testimony from Claimant, his mother, and vocational expert ("VE") Thomas Irons, Ph.D. (AR 40–41.) At the beginning of the hearing, Claimant orally amended his alleged onset date to April 14, 2022, the date he filed his protective application. (AR 45.) The ALJ issued an unfavorable decision on July 18, 2024, finding that Claimant is not disabled under the Social Security Act. (AR 17-31.) On September 16, 2024, the Appeals Council denied Claimant's request for review, (AR 1-5), thus making the ALJ's decision the final decision of the Commissioner. *See Doyal v. Barnhart*, 331

---

[5] Claimant alleges he received a TBI in 2000 when he was involved in an automobile accident. (AR 986, 1002.)

F.3d 758, 759 (10th Cir. 2003). Claimant now seeks reversal and remand of the ALJ's ruling that

he is not disabled. (*See* Docs. 16, 22.)

## THE ALJ'S DECISION

The ALJ reviewed Claimant's claim pursuant to the Commissioner's five-step sequential

evaluation process.[6] (*See* AR 18–19.) At step one, the ALJ found that Claimant has not engaged

in substantial gainful activity since his alleged onset date. (AR 19–20.) The ALJ found at step two

that Claimant suffers from the severe impairments of bipolar disorder, borderline personality

disorder, panic disorder, generalized anxiety disorder, PTSD, a learning disorder, OCD, and a

disorder of the right ankle. (AR 20.) However, the ALJ concluded that Claimant's alleged TBI is

not a medically determinable impairment because it is not "supported by acceptable clinical and

diagnostic techniques." (AR 21.) He also concluded that Claimant's HIV does "not significantly

limit" his ability to "perform basic work activities and [is] non-severe." (AR 20.) At step three, the

ALJ concluded that Claimant does not have an impairment or combination of impairments that

---

[6] The five-step sequential evaluation process requires the ALJ to determine whether:

(1) the claimant engaged in substantial gainful activity during the alleged period of disability;

(2) the claimant has a severe physical or mental impairment (or combination of impairments) that meets the duration requirement;

(3) any such impairment meets or equals the severity of an impairment listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P;

(4) the claimant can return to his past relevant work; and, if not,

(5) the claimant is able to perform other work in the national economy, considering his RFC, age, education, and work experience.

20 C.F.R. § 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof in the first four steps of the analysis, and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

meets or medically equals the criteria of listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 21–22.)

At step four, which has three phases,[7] the ALJ first found that Claimant has the residual functional capacity ("RFC")[8]

> to perform light work as defined in 20 CFR 416.967(b) except: he must alternate from standing to sitting once every hour for ten minutes, but is able to maintain production and will not be off-task while seated; he can occasionally climb, stoop, kneel, crouch, and crawl; he can frequently balance; he can have occasional exposure to hazards such as unprotected heights and moving mechanical parts; he can understand, remember, and carry out simple instructions, make simple decisions, and make simple judgments; he can adapt to occasional changes in a work setting; he can have frequent interactions with supervisors and co-workers; and he can have occasional interactions with the public.

(AR 22–23.) Next, and with the assistance of the VE, the ALJ made findings regarding Claimant's past relevant work, writing that "[C]laimant has past relevant work as a Kitchen Helper," which the VE testified is "medium, unskilled" work. (*See* AR 29, 73.) At the final phase of step four, the ALJ found, citing the VE's testimony, that "a return to past relevant work is precluded." (AR 29.) At step five, the ALJ considered whether an individual possessing Claimant's age, education, work experience, and RFC could perform jobs that exist in significant numbers in the national economy. (AR 30.) Relying on the VE's testimony, the ALJ determined Claimant could perform the representative occupations of cleaner/housekeeper, marker, and routing clerk. (*Id*.) Thus, the ALJ concluded that Claimant is not disabled. (AR 31.)

---

[7] *See Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). In the first phase, "the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC)." *Id*. In the second phase, "the ALJ must make findings regarding the physical and mental demands of the claimant's past relevant work." *Best-Willie v. Colvin*, 514 F. App'x 728, 737 (10th Cir. 2013) (citation omitted). "In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one." *Winfrey*, 92 F.2d at 1023.

[8] A person's residual functional capacity is "the most [the person] can still do" despite the physical and/or mental limitations caused by his impairment(s). 20 C.F.R. § 416.945(a)(1).

6

**STANDARD OF REVIEW**

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Hum. Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).

The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record. *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (citation omitted). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this [C]ourt with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate

7

that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out his specific findings and his reasons for accepting or rejecting evidence." *Id.* at 1010.

DISCUSSION

Claimant argues that the Court should reverse the ALJ's decision and remand the case to the Commissioner for either of two reasons. (*See generally* Docs. 16, 22.) First, he contends the ALJ failed to account for two moderate mental limitations that non-examining state agency psychologist Renate Wewerka, Ph.D. found on initial review. (Doc. 16 at 8.) Second, Claimant argues the ALJ improperly assessed the opinion of Elena Crespin, PMHNP-BC, who performed a mental status examination on Claimant in December 2022 at the request of Disability Determination Services ("DDS"). (*Id.* at 13–14.) After careful consideration of the parties' arguments and a meticulous review of the record, I agree with Claimant that the ALJ erred by failing to incorporate into his RFC finding two of the moderate mental limitations found by Dr. Wewerka or to explain why he rejected such limitations. I also agree with Claimant that the ALJ's decision fails to demonstrate that he followed the applicable legal principles in evaluating NP Crespin's medical opinion. Because I cannot say that the ALJ's decision evinces compliance with the applicable legal standards and is supported by substantial evidence, the Commissioner's decision should be reversed and remanded for further proceedings.

## I.    The ALJ Erred by Failing to Account for Moderate Mental Limitations Dr. Wewerka Assessed.

Claimant first argues that the ALJ erred in assessing the prior administrative findings of Dr. Wewerka, the non-examining state agency psychologist. (*See* Doc. 16 at 8–13; Doc. 22 at 1–

8

2.) Specifically, Claimant contends the ALJ failed to account for Dr. Wewerka's findings that he has moderate mental limitations in his abilities to "accept instructions and respond appropriately to criticism from supervisors" and "to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." (Doc. 16 at 12–13 (citing AR 91).) For the reasons articulated below, I agree with Claimant.

### A. Overview of the Law Applicable to Prior Administrative Medical Findings

Because Claimant applied for SSI after March 27, 2017, the ALJ was required to evaluate the medical opinions and prior administrative medical findings in the record pursuant to 20 C.F.R. § 416.920c. The opinions of non-examining state agency consultants, like Dr. Wewerka, are considered "prior administrative medical findings." 20 C.F.R. § 416.913a(b); *Vigil v. Saul*, Civ. No. 20-632 CG, 2021 WL 2117184, at *5 (D.N.M. May 25, 2021). However, "the rules for weighing them are the same as for weighing medical opinions." *Saiz v. Kijakazi*, Civ. No. 21-0681 KRS, 2022 WL 4235325, at *3 (D.N.M. Sep. 14, 2022) (citation omitted); *see also* 20 C.F.R. §§ 416.920c(a)-(c), 416.913a(b)(1) (providing that ALJs "must consider this evidence according to §§ 416.920b, 416.920c, and 416.927, as appropriate, because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation"). "Under the revised regulations, no specific evidentiary weight or deference is given to prior administrative findings." *Ortiz v. Kijakazi*, Civ. No. 21-1016 KK, 2023 WL 2538834, at *4 (D.N.M. Mar. 16, 2023) (citing 20 C.F.R. § 416.920c(a)). Rather, they are evaluated on equal footing with other medical opinions using the factors enumerated in the regulations. *See* 20 C.F.R. § 416.920c(1)-(5).

In evaluating medical opinions or prior administrative medical findings, an ALJ must consider "all relevant evidence in the case record" before reaching his disability determination.

*Silva v. Saul*, Civ. No. 19-913 WJ/KK, 2020 WL 4220862, at *4 (D.N.M. July 23, 2020) (citing 20 C.F.R. §§ 404.1520b, 416.920b), *report and recommendation adopted*, Civ. No. 19-913 WJ/KK, 2020 WL 7890832 (D.N.M. Aug. 7, 2020). Moreover, when analyzing a medical opinion or prior administrative medical finding, an ALJ must ensure that a reviewing court has a "sufficient basis to determine that appropriate legal principles have been followed." *Jensen*, 436 F.3d at 1165 (citation omitted).

### B. Structure of Non-Examining State Agency Psychological Consultants' Findings

Non-examining state agency psychological consultants, such as Dr. Wewerka, prepare their assessments using the electronic Claims Analysis Tool ("eCAT"). *See Carrillo v. Saul*, Civ. No. 19-292-KRS, 2020 WL 6136160, at *5 (D.N.M. Oct. 19, 2020). In doing so, they first use the Psychiatric Review Technique ("PRT"). *See id.* "The PRT is used at steps two and three of the initial-level sequential evaluation process to determine whether a medically determinable mental impairment is severe and, if so, whether it meets or medically equals a listed impairment." *Ortiz*, 2023 WL 2538834, at *4 (citing POMS DI § 24583.005(A)).[9] Here, Dr. Wewerka examined the Listing of Impairments' "Paragraph B" criteria for mental impairments at the initial level of review.[10] (AR 87.) Dr. Wewerka found that Claimant has moderate limitations in his abilities to interact with others and to concentrate, persist, or maintain pace. (*Id.*)

---

[9] While the POMS provisions do not have the force of law and are not binding on the SSA, *see Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000), the Tenth Circuit has explained that they are nevertheless entitled to deference unless they are "arbitrary, capricious, or contrary to law." *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999).

[10] The PRT requires a rating of the degree of any functional limitations a claimant may possess in the four "Paragraph B" criteria of: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and, (4) adapting or managing oneself. *See* 20 C.F.R. § 416.920a(c)(3).

"At step four of the sequential evaluation process, state agency consultants use another eCAT form, the Mental Residual Functional Capacity Assessment ("MRFCA"), to assess a claimant's mental RFC." *Ortiz*, 2023 WL 2538834, at *4; *see also* POMS DI § 24510.060(A)(1). Whereas the "PRT has overall ratings for various categories, including maintaining concentration, persistence, or pace, … the MRFCA has more focused categories for use in determining RFC." *Lull v. Colvin*, 535 F. App'x 683, 686 (10th Cir. 2013). "The MRFCA form directs a consultant to first 'record preliminary conclusions about the effect of the impairment(s) on each of four general areas of mental function' in a question-and-answer worksheet."[11] *Saiz v. Kijakazi,* Civ. No. 22-742 DHU/KK, 2023 WL 5368889, at *4 (D.N.M. Aug. 22, 2023) (quoting *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1159 (D.N.M. 2016)), *report and recommendation adopted*, Civ. No. 22-742 DHU/KK, 2024 WL 4333215 (D.N.M. Sep. 27, 2024). Next, the MRFCA form instructs the consultant to "prepare a narrative statement of mental RFC." POMS DI § 24510.061(A). If the consultant finds that a claimant has moderate mental limitations in an area of functioning, he or she must describe "the degree and extent of the capacity or limitation" in a "narrative format." POMS DI § 24510.063(B)(2). At the end of the MRFCA form, there is typically a section entitled "MRFC-Additional Explanation," which is reserved for "[a]ny other assessment information deemed appropriate." *Saiz*, 2023 WL 5368889, at *4; (*see also* AR 92.)

When a disability claim reaches an ALJ, the "MRFCA form is no longer the adjudication of the case; rather it becomes *evidence* that the ALJ must consider in making her own new,

---

[11] Previously, state agency consultants completed form SSA-4734-F4-SUP, which was formally divided into Section I ("Summary Conclusions" containing checkboxes) and Section III ("Functional Capacity Assessment"). *See Vienna v. Saul*, Civ. No. 18-783 LF, 2019 WL 4686718, at *4 n.8 (D.N.M. Sept. 26, 2019). Although MRFCAs completed through eCAT no longer include the same section labels, "parties and the courts have continued to refer to the checkbox portion of each MRFCA as 'Section I,' and the 'narrative' portion(s) as 'Section III.'" *Id*. In these Proposed Findings and Recommended Disposition, I refer to these separate sections of the MRFCA as the "worksheet portion" and the "narrative portion."

independent findings." *Silva,* 203 F. Supp. 3d at 1159. "All findings from the MRFCA form are considered by the ALJ and, generally speaking, '[t]he distinction between the [the worksheet portion] and [the narrative portion], which was meaningful for the physician adjudicator, has little to no bearing on how the ALJ must weigh the MRFCA report.'" *Ortiz*, 2023 WL 2538834, at *5 (alterations in original) (quoting *Carrillo*, 2020 WL 6136160, at *6).

### C. Dr. Wewerka's Findings and the ALJ's Decision

In the worksheet portion of the MFRCA form, Dr. Wewerka found that Claimant is moderately limited in the following areas of mental functioning:

• The ability to carry out detailed instructions;
• The ability to maintain attention and concentration for extended periods;
• The ability to work in coordination with or in proximity to others without being distracted by them;
• The ability to interact appropriately with the general public;
• The ability to accept instructions and respond appropriately to criticism from supervisors; and,
• The ability to get along with coworkers or peers without distracting them or exhibiting extreme behaviors.

(AR 91.) Notwithstanding her inclusion of these moderate mental limitations in the worksheet portion of the MRFCA form, Dr. Wewerka appears to have found Claimant less limited in the "Additional Explanation" section. (AR 92.) In this section of the MRFCA, she opined that Claimant can "understand, remember and carry out at least simple instructions, make decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors and respond appropriately to changes in a work setting." (*Id*.)

The ALJ found Dr. Wewerka's prior administrative findings "generally persuasive." (AR 27.) He expounded that

[t]he opinion as to [Claimant's] mental function is consistent with the findings from the consultative psychological evaluation, which indicated some deficits in attention and concentration and circumstantial thought processes, and the longitudinal evidence, which indicates some anxiousness and fluctuations in his

mood, but also him being alert, oriented, having intact memory, normal thought content, and predominantly having normal thought processes.

(*Id*.) However, as further discussed below, the ALJ does not appear to have incorporated into his RFC finding all of the moderate mental limitations Dr. Wewerka assessed in the worksheet portion of the MRFCA. (*Compare* AR 22–23 *with* AR 91.)

### D. Analysis

While ALJs are not required to adopt specific findings of non-examining state agency consultants, *see Wells v. Colvin*, 727 F.3d 1061, 1071 (10th Cir. 2013), "this does not mean tha[t] an ALJ can turn a blind eye to moderate" mental limitations found in the worksheet portion of an MRFCA form. *Ortiz v. O'Malley*, Civ. No. 22-660 LF, 2024 WL 278290, at *4 (D.N.M. Jan. 25, 2024) (citation omitted). A non-examining state agency consultant's finding of moderate mental limitations in the worksheet portion of an MRFCA form is "evidence that the ALJ must consider in making [his] own, new independent findings." *Silva*, 203 F. Supp. 3d at 1159. Moreover, "the POMS, regulations, and caselaw require the ALJ to address all of a doctor's findings, not just those" in the narrative portion of an MRFCA. *Ortiz*, 2024 WL 278290, at *4 (citing *Silva*, 203 F. Supp. 3d at 1158–66). Additionally, an ALJ has a duty to explain why he adopted some limitations found by a medical source while rejecting others. *See Lobato v. Kijakazi*, Civ. No. 21-207 JB/KK, 2022 WL 500395, at *10-*11 (D.N.M. Feb. 18, 2022), *report and recommendation adopted*, Civ. No. 21-207 JB/KK, 2022 WL 3909284 (D.N.M. Aug. 31, 2022).

"When an ALJ does not clearly account for a [worksheet portion] limitation, this Court must analyze whether the corresponding … narrative [portion] 'adequately encapsulates' that limitation." *Ortiz*, 2024 WL 278290, at *5 (quoting *Carver v. Colvin,* 600 F. App'x 616, 619 (10th Cir. 2015)). A narrative portion of an MRFCA adequately encapsulates moderate mental limitations found in the worksheet portion when the narrative portion "does not contradict any

[worksheet portion] limitations and describes the effect each [worksheet portion] limitation would have on the claimant's mental RFC." *Fulton v. Colvin,* 631 F. App'x 498, 502 (10th Cir. 2015). "[A]n ALJ may only disregard limitations found in the worksheet portions when the narrative portions 'adequately encapsulate[]' them." *Lucero v. Kijakazi*, Civ. No. 21-425 KK, 2022 WL 2315957, at *11 (D.N.M. June 28, 2022) (alteration in original) (quoting *Carver*, 600 F. App'x at 619). If the narrative portion of the MRFCA "does not adequately encapsulate the omitted limitation and the ALJ did not explain the omission, the ALJ has committed legal error requiring remand." *Ortiz*, 2024 WL 278290, at *5; *see also Parker v. Comm'r*, *SSA*, 772 F. App'x 613, 615 (10th Cir. 2019) ("If the agency had decided to omit particular limitations embodied in the two medical opinions, the agency needed to explain the omissions.").

Here, as noted, Dr. Wewerka found in the worksheet portion of the MRFCA that Claimant has moderate mental limitations in his abilities to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 91.) However, in reviewing the ALJ's RFC assessment and discussion of Dr. Wewerka's opinion, I cannot discern that the ALJ accounted for these moderate mental limitations. (*See generally* AR 27.) The ALJ wrote that he found Dr. Wewerka's opinion "generally persuasive." (*Id*.) Additionally, he stated that Dr. Wewerka's opinion was "well-supported by a narrative contained within the disability determination." (*Id*.) Yet the ALJ did not mention the above-referenced moderate mental limitations Dr. Wewerka found in the worksheet portion of the MRFCA, nor did he offer even a cursory explanation for rejecting them.

Limiting a claimant to "frequent" interactions with supervisors and coworkers does not adequately account for moderate limitations in the claimant's abilities to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers

without distracting them or exhibiting behavioral extremes. *See e.g. Duran v. Berryhill*, Civ. No. 18-734 SMV, 2019 WL 1992103, at *4 (D.N.M. May 6, 2019) (concluding an ALJ's RFC finding of "frequent interactions with supervisors" did not account for moderate limitations in the abilities to interact with supervisors and to accept instructions from and respond appropriately to criticism from supervisors); *Vialpando v. Comm'r, Soc. Sec. Admin.*, Civ. No. 19- 2655 STV, 2021 WL 1222493, at *2 (D. Col. Apr. 1, 2021) ("Here, the Court found the ALJ erred by simultaneously adopting Dr. Frommelt's conclusions that Plaintiff was moderately impaired in dealing with others but nonetheless crafting an RFC that allowed for frequent interaction with coworkers and supervisors"); *Macquire v. Comm'r of Soc. Sec.*, Civ. No. 21-72 CDB, 2023 WL 8242069, at *6 (E.D. Cal. Nov. 28, 2023) ("Here, the RFC limits Plaintiff to 'frequent, but not constant, face-to-face interaction with supervisors, coworkers, and the public.' This limitation fails to account for Dr. Stafford's moderate limitation to interact with co-workers, supervisors, and the public." (internal citation omitted)); *Donna W. v. Kijakazi*, Civ. No. 21-11285, 2023 WL 869097, at *9 (D.N.J. Jan. 27, 2023) (concluding an ALJ's RFC assessment allowing frequent interaction with supervisors and coworkers was inconsistent with another RFC finding of moderate limitation in interacting with others); *Joel B. v. Comm'r of Soc. Sec. Admin*, Civ. No. 20-110 JCF, 2022 WL 16709722, at 8–9 (N.D. Ga. Feb. 15, 2022) (concluding an ALJ's RFC assessment allowing "frequent contact" with supervisors did not adequately account for previously assessed moderate limitations in interacting with supervisors). This is because "frequent" in this context "means occurring from one-third to two-thirds of the time." SSR 83-10, 1983 WL 31251, at *6. In other words, "frequent" means up to six hours of an eight-hour workday. *Id.*

Because Dr. Wewerka's narrative portion of the MRFCA does not adequately encapsulate the at issue moderate social limitations she found, the ALJ's reliance on the narrative explanation

alone was insufficient. In the narrative portion of the MRFCA, Dr. Wewerka wrote, "see prtf," (AR 91), an apparent reference to her "Additional Explanation" in the PRT form. *See Bernadette S. v. King*, Civ. No. 24-124 JB/GJF, 2025 WL 399735, at *6 (D.N.M. Feb. 5, 2025) (concluding that a non-examining state agency consultant was referencing a narrative explanation in the PRT form when the consultant wrote, "see prtf" in the narrative portion of the MRFCA), *report and recommendation adopted sub nom. Bernnadette S. v. Dudek*, Civ. No. 24-124 JB/GJF, 2025 WL 89244 (D.N.M. Mar. 24, 2025). Despite not being in technical compliance with the directions of the POMS or MRFCA form, this does not necessarily constitute reversible error. *See id.* at *8 (noting that "any technical deviations from the prescribed instructions for completing the PRT and MRFC are not indicative" of the consultant's "confusion as to the purpose of the respective assessment tools," and that the consultant's "cross-reference to the PRT [did not] render suspect her MFRC findings"); *see also Padilla v. Berryhill*, Civ. No. 17-329 GJF, 2018 WL 3830930, at *10–14 (D.N.M. Aug. 13, 2018) (concluding that a non-examining state agency consultant writing "see PRTF" in the narrative portion of MRFCA did not constitute error where the consultant included a narrative explanation in the "Additional Explanation" section of the form and the ALJ adequately accounted for assessed limitations).

However, even after incorporating Dr. Wewerka's additional explanation in the PRT form into the narrative portion of her MRFCA findings, I cannot conclude that the narrative portion of the MRFCA adequately encapsulates the moderate limitations she found in the worksheet portion of the MRFCA. (*See generally* AR 87.) In her additional explanation in the PRT form, Dr. Wewerka recounted some of Claimant's medical history and treatment records. (*Id.*) For instance, she noted that Claimant's treatment records from Counseling World, LLC showed "intact attention/concentration seen on the exam. The patient had normal recent and remote memory. Fund

16

of knowledge included normal awareness of current and past events. The patient had intact verbal intelligence. The patient had intact cognitive flexibility." (*Id.*) Further, Dr. Wewerka indicated she reviewed a functional report concerning Claimant, which provided that he "drives, shops in stores, pays bills, counts change, has hobbies, socializes, can follow written instructions." (*Id.*) Dr. Wewerka also wrote, in reference to the functional report she reviewed, that Claimant's "alleged severity limitations" were "at the most partially consistent with records which do not indicate any severe limitations." (*Id.*)

However, except to state that his medical records and function report did not indicate severe limitations, Dr. Wewerka's PRT form additional explanation is devoid of any discussion regarding the moderate mental limitations she found in the worksheet portion of the MRFCA or their effect on Claimant's RFC. (*See generally id.*) In short, her PRT form additional explanation, and thus her narrative portion of the MRFCA, do not adequately encapsulate the moderate limitations she found in the worksheet portion of the MRFCA. *See Ortiz*, 2024 WL 278290, at *4 (noting that the narrative section of an MRFCA form only adequately encapsulates moderate mental limitations assessed in the worksheet portion if it "does not contradict any [worksheet portion] limitations and describes the effect each [worksheet portion] limitation would have on the claimant's mental RFC") (citation omitted)). Therefore, this part of the narrative portion of the MRFCA cannot be considered substantial evidence that supports the ALJ's RFC finding. *See Carver*, 600 F. App'x at 619 ("[I]f a consultant's Section III narrative [portion] fails to describe the effect that each of the Section I [worksheet portion] moderate limitations would have on the claimant's ability, or if it contradicts limitations marked in Section I, the MRFCA cannot properly be considered part of the substantial evidence supporting an ALJ's RFC finding.").

Nevertheless, this does not end the Court's analysis because the "Additional Explanation" section of the MRFCA is also part of the narrative portion of an MRFCA form. *See Kantor v. Kijakazi*, Civ. No. 21-717 KK, 2023 WL 2538786, at \*5 n.11 (D.N.M. Mar. 16, 2023) ("[W]hat is referred to as the 'Section III' narrative in case law corresponds to the narratives associated with each of the four categories and/or the narrative provided in the 'additional explanation' box."); *see also Kim L.P. v. Saul*, Civ. No. 18-552 JED-FHM, 2020 WL 5802927, at \*3 (N.D. Okla. Sep. 29, 2020) ("Moreover, the eCAT's instructions make clear that *all* narrative responses [on the eCAT MRFCA] are part of a whole and form the completing psychologist's findings regarding the claimant's functional capacity."). In the "Additional Explanation" section of the MRFCA, Dr. Wewerka wrote that Claimant can "interact adequately with co-workers and supervisors." (AR 92.) Yet in the worksheet portion of the MRFCA, she found that Claimant has moderate limitations in his abilities to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 91.) By finding moderate limitations, Dr. Wewerka found that Claimant's ability to perform these activities is impaired. *Ortiz*, 2023 WL 2538834, at \*7 ("The Court begins with the premise that by assessing a moderate limitation in a claimant's ability to perform an activity, a medical source indicates that the ability is 'impaired.'" (citation omitted)); *see also Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) ("[A] moderate impairment is not the same as no impairment at all."); POMS DI § 24510.063(B)(2) (providing that a medical source should check the box for "moderately limited" on an MRFCA form "when the evidence supports the conclusion that the individual's capacity to perform the activity is impaired").

Moderate limitations in the abilities to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or

exhibiting behavioral extremes, directly impact a claimant's ability to interact with coworkers and supervisors. *See* Mental Residual Capacity Assessment form, SSA-4734-F4-SUP (listing the abilities to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes in the "Social Interaction" category); *see also Chapo*, 682 F.3d at 1289–90 (dividing mental limitations into categories of "vocational significance" and placing limitations in the abilities to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes in the category of "Interaction with supervisors and coworkers"). Yet despite her findings of impairment in the worksheet portion, Dr. Wewerka found in the "Additional Explanation" section that Claimant could "interact adequately with coworkers and supervisors." (AR 92.) In other words, Dr. Wewerka's findings in the worksheet portion and "Additional Explanation" section of the MRFCA are in conflict. *See Jones v. Berryhill*, Civ. No. 15-842 LF, 2017 WL 3052748, at *6 (D.N.M. June 15, 2017) (concluding a worksheet portion finding of a moderate limitation in the ability to accept instructions and respond appropriately to criticism from supervisors conflicted with a narrative portion finding that the claimant could "interact adequately" with coworkers and supervisors). Therefore, the "Additional Explanation" section of Dr. Wewerka's MRFCA does not adequately encapsulate the MRFCA's worksheet portion findings and cannot be considered substantial evidence supporting the ALJ's RFC finding. *See Carver*, 600 F. App'x at 619.

Furthermore, to adequately encapsulate a worksheet portion limitation, the narrative portion of a MRFCA must not contradict any worksheet portion limitations *and* must describe the effect each worksheet portion limitation would have on a claimant's mental RFC. *Ortiz*, 2024 WL 287290, at *4. Yet Dr. Wewerka's "Additional Explanation" section fails to describe the effects the

moderate limitations she assessed in the worksheet portion would have on Claimant's mental RFC. This is another reason for concluding that Dr. Wewerka's "Additional Explanation" section does not adequately encapsulate the moderate limitations she assessed in the worksheet portion of the form and cannot be considered substantial evidence supporting the ALJ's RFC finding. *See Carver*, 600 F. App'x at 619.

Because the ALJ failed to explain his apparent rejection of at least two of the moderate mental limitations Dr. Wewerka assessed in the worksheet portion of MRFCA, and because such limitations were not adequately encapsulated in the narrative portion of the MRFCA she completed, I cannot conclude that the applicable legal principles were applied or that the ALJ's decision was supported by substantial evidence. I therefore recommend reversing and remanding on this issue.

## II.    The ALJ Erred in Assessing NP Crespin's Medical Opinion

Claimant also argues that the ALJ improperly assessed NP Crespin's opinion. (Doc. 16 at 13–20.) Specifically, he asserts that in rejecting NP Crespin's opinion, the ALJ mischaracterized the opinion as vague, and failed to comply with the agency's supportability and consistency articulation requirements for evaluating medical opinions. (*Id*. at 16–20.) I find that Crespin's opinion is not vague and that the ALJ's assessment of the opinion does not comport with agency regulations' articulation requirements for evaluating medical opinions. I therefore recommend that the ALJ's decision be reversed and remanded on this basis as well.

### A.  NP Crespin's Opinion

NP Crespin performed a mental status exam ("MSE") on Claimant on December 17, 2022. (AR 1000.) MSEs "document a clinician's observations of the patient at a particular point in time and cover a variety of categories, including appearance, emotions, thoughts, cognition, judgment,

and insight." *Cruz v. Kijakazi*, Civ. No. 20-1162 GBW, 2022 WL 970153, at *5 (D.N.M. Mar. 31, 2022) (quoting *McGehee v. Saul*, Civ. No. 18-1164 KK, 2019 WL 6219507, at *6 (D.N.M. Nov. 21, 2019)).

During her examination of Claimant, NP Crespin obtained a detailed history, reviewing Claimant's psychosocial, educational, psychiatric, medical, and substance abuse history and his activities of daily living. (AR 1000-02.) NP Crespin also made a number of observations. Thus, she observed that Claimant had good eye contact, good grooming, a cooperative attitude, and normal alertness, and found the volume, articulation, and spontaneity of his speech to be normal but its "[r]ate/rhythm" and amount to be "over productive." (AR 1002–03.) Additionally, she observed that Claimant's "mood" was "pleasant." (AR 1003.) NP Crespin documented that Claimant was not experiencing suicidal or homicidal ideations, had a logical thought process and normal memory, was oriented to "person/place/time/situation," and could recall three objects. (*Id.*) However, she observed that the "[s]tream" of his thought process was "circumstantial" and his "[a]ttention/concentration" was impaired. (*Id.*) She added that Claimant's "[s]erial 7's or 3's" were "incorrect" and that he had "difficulty completing" and "needed prompting to complete" them.[12] (*Id.*) She found Claimant's intellect to be "average/below average," his insight "impaired," and his judgment "fair to good." (AR 1004.)

NP Crespin diagnosed Claimant with Bipolar I disorder, panic disorder, PTSD, "amphetamine use disorder, severe in early remission," and an "unspecified learning disorder." (AR 1004.) She also noted that Claimant's "panic disorder and anxiety are likely related to

---

[12] Serial 3s and 7s are "tests used to assess concentration." *Salmon v. Astrue*, Civ. No. 10-3636 LHK, 2012 WL 1029329, at *7 (N.D. Cal. Mar. 26, 2012).

suboptimal management of his bipolar disorder." (*Id.*) She recommended that he take "a mood stabilizer or atypical antipsychotic" and that he "continue individual and group therapy." (*Id.*)

Finally, NP Crespin gave her opinion regarding Claimant's functional abilities in four broad areas of functioning, *i.e.*, "Understand and Remember," "Social Interaction," "Continued Concentration and Task Completion," and "Adaptation." (AR 1004-05.) Under "Understand and Remember," NP Crespin found that Claimant has a "[m]ild" limitation in his ability to understand and remember complex instructions. (*Id.*) Under "Social Interaction," she assessed that Claimant has "moderate" limitations in his abilities to interact with the public and with peers at work. (*Id.*) Under "Continued Concentration and Task Completion," NP Crespin assessed that Claimant has a "moderate" limitation in his ability to complete instructions and "[m]oderate to severe" limitations in his abilities to concentrate and persist at tasks, as well as a "severe" limitation in his ability to work without supervision. (*Id.*)

### B. The ALJ's Evaluation of NP Crespin's Opinion

At step four of the sequential evaluation process, the ALJ found NP Crespin's opinion to be "unpersuasive." (AR 28.) The ALJ gave two reasons for this assessment. First, he stated that "[t]he opinion is largely vague by using imprecise terminology in describing the claimant's functional limitations (and capabilities)." (*Id.*) As an example, the ALJ stated that NP Crespin's opinion "indicates the claimant has 'moderate' difficulties in interacting with the public and peers at work; however, it is unclear as to what moderate actually means." (*Id.*)

Second, the ALJ concluded that NP Crespin's opinion was "inconsistent with the longitudinal evidence." (AR 29.) On this point, he reasoned:

> [W]hile the consultative evaluation indicated some deficits in attention and
> concentration and circumstantial thought processes, these findings were not
> consistently indicated in the claimant's actual treatment records. The longitudinal
> evidence with treating providers, relevant to the period at issue, indicates some

anxiousness and fluctuations in his mood, but also him being alert, oriented, having intact memory, normal thought content, and predominantly normal processes. (*See for example*: Exhibits B6F, pages 1, 2, 7–13; B8F, pages 5–21; B10F).[13] Additionally, he has acknowledged working part-time and engaging in activities that include bookkeeping, running errands, and caring for young children. He also acknowledged having a driver's license, being capable of driving a car, and spending time with friends.  These are all activities that require a greater level of function than this opinion seemingly allows.

(*Id*. (footnote added).)

### C.  Applicable Legal Standards for Evaluating Medical Opinions

An ALJ is required to articulate how persuasive he finds all of the medical opinions and all of the prior administrative medical findings in the case record. *See* 20 C.F.R. § 416.920c(b). When a medical source "provides multiple medical opinion(s) or prior administrative medical finding(s)," the ALJ need only articulate how he "considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis." 20 C.F.R. § 416.920c(b)(1). In other words, an ALJ is not required "to articulate how [he] considered each medical opinion or prior administrative medical finding from one medical source individually." *Id.* However, this does not,

in the Court's view, alter the Tenth Circuit's requirement that an ALJ must explain his rejection of any medical source opinions in the record concerning the claimant's RFC. This requirement flows from the premise that an ALJ's decision must discuss the uncontroverted evidence the ALJ chooses not to rely upon, as well as significantly probative evidence he rejects, in order to provide the Court with a sufficient basis to determine that appropriate legal principles have been followed. The requirement enables the courts to engage in meaningful judicial review of agency decisions.

*Lobato*, 2022 WL 500395, at *10–11 (citations, quotation marks, and brackets omitted)

In evaluating the persuasiveness of medical opinions, an ALJ is to consider five factors:

(1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and, (5)

---

[13] (*See* AR 553–54, 559–65, 611–27, 736–54.)

other factors that support or contradict a medical opinion or finding. 20 C.F.R. § 416.920c(c)(1)–(5). An ALJ is always required to articulate how he considered supportability and consistency. *See* 20 C.F.R. § 416.920c(b)(2) ("[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinion or prior administrative medical findings in your determination or decision."). However, an "ALJ is only required to explain how he … considered the other three factors if differing medical opinions are equally well-supported and consistent with the record." *Arteaga v. Kijakazi*, Civ. No. 21-530 JMR, 2023 WL 3613342, at *4 (D.N.M. May 24, 2023) (citing 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3)).

> The Tenth Circuit has explained that the supportability factor
>
> examines how closely connected a medical opinion is to the evidence and medical source's explanations: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), the more persuasive the medical opinions will be."

*Zhu v. Comm'r, SSA*, No. 20-3180, 2021 WL 2794533, at *6 (10th Cir. July 6, 2021) (brackets and ellipses omitted) (quoting 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1)). In other words, supportability examines "how well a medical source supported his own opinions with 'objective medical evidence' and 'supporting explanations.'" *Zambrano v. Kijakazi*, Civ. No. 20-1356 KRS, 2022 WL 1746765, at *6 (D.N.M. May 31, 2022) (quoting 20 C.F.R. § 404.1520c(c)(1)).

Consistency, on the other hand, "compares a medical opinion to the evidence: 'The more consistent a medical opinion(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) will be.'" *Nathan H. v. O'Malley*, Civ. No. 23-00756 JMR, 2024 WL 3633790, at *5 (D.N.M. Aug. 2, 2024) (quoting 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2)). In other words, consistency "calls for a comparison between the subject medical opinion and 'the evidence from medical sources and nonmedical sources' in the record." *Zambrano*, 2022 WL 1746765, at *5 (citation omitted).

24

In evaluating medical opinions, "[a]n ALJ must, at the very least, provide an explanation that allows the reviewing court to follow his reasoning and communicates how he considered the factors of consistency and supportability for each medical source's opinions." *Id*. Although the regulations do not specify how thoroughly an ALJ must analyze supportability and consistency, an ALJ's explanation must "eschew rote analysis and conclusory explanations and discuss the crucial factors in any determination with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Frazer v. Kijakazi*, Civ. No. 20-1147 GBW, 2022 WL 682661, at *5 (D.N.M. Mar. 8, 2022) (brackets and ellipses omitted) (quoting *Pamela P. v. Saul*, Civ. No. 19-575 DJS, 2020 WL 2561106, at *5 (N.D.N.Y. May 20, 2020)).

### D.  Analysis of the ALJ's Assessment of NP Crespin's Opinion

### 1.  Vagueness

The ALJ erred by finding NP Crespin's opinion to be vague due to her use of terms such as "moderate" in describing the mental functional limitations she found Claimant to have. As noted, NP Crespin found that Claimant has a mild limitation in his ability to understand and remember complex instructions, a moderate limitation in his abilities to interact with the public and with peers at work, a moderate limitation in his ability to complete instructions, a moderate to severe limitation in his abilities to concentrate and persist at tasks, and a severe limitation in his ability to work without supervision. (AR 1004.) NP Crespin performed her consultative MSE at the request of DDS, a state agency that acts on behalf of the Social Security Administration to evaluate claimants. *See Martin v. Comm'r v. Soc. Sec.*, Civ. No. 12-15093, 2014 WL 562248, at *3 (E.D. Mich. Feb. 13, 2014) (explaining that DDS is "a state agency that helps the Social Security Administration evaluate claimants"). This fact is relevant because consultative examinations are purchased only from qualified medical sources. *See* 20 C.F.R. § 416.919g(a) ("We will purchase a

consultative examination only from a qualified medical source."). And qualified medical sources have a "good understanding of [SSA's] disability programs and their evidentiary requirements." 20 C.F.R. § 416.919n.

The term "moderate," which NP Crespin used to describe Claimant's limitations in several areas of mental functioning, is a term of art that is frequently used to describe a claimant's mental limitations in the Social Security context. *See* 20 C.F.R. § 416.920a(c)(4) ("[W]e will use the following five-point scale: None, mild, moderate, marked, and extreme."); *see also* POMS DI § 24510.063(B)(2) (stating a moderate limitation exists when "the evidence supports the conclusion that the individual's capacity to perform the activity is impaired"); *Ortiz*, 2023 WL 2538834, at *7 (explaining that by noting a moderate limitation, "a medical source indicates that a claimant's ability is 'impaired'"). NP Crespin, being a qualified medical source, did not need to define the term "moderate" in her opinion to describe the mental limitations she assessed Claimant has, because she would use that term as it is commonly understood in the Social Security context. *Cf. Shaw v. Berryhill*, Civ. No. 16-285 LF, 2017 WL 4119617, at *5 (D.N.M. Sept. 15, 2017) ("Dr. Murphy did not need to define the term 'marked' because, as a qualified medical source with a good understanding of the disability programs and evidentiary requirements, he would use the term 'marked' as defined by the regulations."). Thus, NP Crespin's failure to define "moderate" in her MSE report is not a valid reason for the ALJ to find her opinion unpersuasive.

The Commissioner's argument that NP Crespin's "conclusions were vague because they lacked specificity with respect to vocationally relevant terms or explanation" [14] (Doc. 19 at 12) is

---

[14] In support, the Commissioner cites to *Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995). (Doc. 19 at 12-13.) However, *Bean* is materially distinguishable because it concerned the use of the term "severe" in relation to physical exertional limitations, which are governed by a different classification system than mental limitations. *See Bean*, 77 F.3d at 1214.

unavailing. There is no "bright-line rule that the use of severity ratings such as 'moderate' or 'marked' when assessing a claimant's ability to do work-related mental activities fails to indicate exactly what a claimant can do and are therefore inherently vague." *Maldonado v. Kijakazi*, Civ. No. 21-862 JFR, 2022 WL 7009784, at *11 (D.N.M. Oct. 12, 2022). Moreover, the opinions NP Crespin expressed about Claimant's mental functioning were not made in isolation but were instead expressed in a table that identified four broad categories of mental functioning nearly identical to those deemed relevant by the Social Security Administration. (*See* AR 1004); *see also* 20 C.F.R. § 416.920a(c)(3) ("We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself."). In sum, vagueness was not a valid reason for the ALJ to discount NP Crespin's opinion.[15]

### 2. Supportability

Claimant argues that it is "difficult to decipher" whether the ALJ addressed supportability in his decision. (*Id.* at 17.) Claimant acknowledges that the ALJ did mention that NP Crespin found "some deficits in attention and concentration and circumstantial thought processes" during her examination. (*Id.* (quoting AR 29).) However, Claimant contends "he only did so in comparison with the evidence picked and chose[n] from the record." (*Id.*) Additionally, Claimant claims that

---

[15] However, I do not find persuasive Claimant's argument that the ALJ should have contacted NP Crespin for clarification if he believed her opinion to be vague. (Doc. 16 at 16.) The applicable regulation provides that if a consultative examiner's "report is inadequate or incomplete, we will contact the medical source who performed the consultative examination[.]" 20 C.F.R. § 416.919p(b). But even assuming the ALJ's finding of vagueness equates to a finding of inadequacy or incompleteness under this regulation, vagueness was only one of the reasons the ALJ gave for rejecting NP Crespin's opinion. Specifically, the ALJ also found her opinion to be unpersuasive because he believed "the opinion is inconsistent with the longitudinal evidence." (AR 29.) This cuts against Claimant's argument that the ALJ should have recontacted NP Crespin for clarification. *See J.L.H. v. Comm'r, Soc. Sec. Admin.*, Civ. No. 22-1586 KAS, 2024 WL 1177937, at * (D. Col. Mar. 19, 2024) (rejecting a claimant's argument that the ALJ should have recontacted a medical source due to the medical source's opinion being vague because this was not the only reason the ALJ gave for rejecting the medical source's opinion).

the ALJ's use of the phrase "some" is "a mischaracterization of the findings upon consultative examination[,] as circumstantial thought process, impaired attention and concentration, and incorrect serial threes and sevens directly support NP Crespin's opinion[,] particularly the moderate to severe findings under 'Concentration and Task Completion.'" (*Id.* (citing AR 1004).)

In his response, the Commissioner argues that the ALJ sufficiently articulated his consideration of the supportability factor in evaluating NP Crespin's opinion. In support, the Commissioner first contends that the ALJ's discussion of the alleged vagueness of NP Crespin's opinion is germane to supportability. (Doc. 19 at 12 (citing 20 C.F.R. § 416.920c(c)(1)).) However, the Commissioner does not provide any reasoning to explain the alleged connection between vagueness and supportability in this instance. Moreover, even if the Commissioner had done so, as just discussed, vagueness was not a valid reason for the ALJ to find NP Crespin's opinion unpersuasive here. Therefore, I reject this argument.

The Commissioner also contends that the ALJ's "overall discussion" regarding supportability "was adequate, and he was not required to further explain his findings[.]" (*Id.* at 13.) However, as explained below, the Commissioner is mistaken. In her report, NP Crespin documented the detailed history she obtained from Claimant, the diagnoses she gave, and the numerous findings she made regarding Claimant's appearance, motor activity, speech, affect, mood, thought content, thought process, perception, intellect, insight, and judgment. (AR 1002–04.) A reasonable adjudicator could certainly conclude that the history, diagnoses, and observations NP Crespin documented support her opinion, and her observations, in particular, constitute objective medical evidence. *See* 20 C.F.R. §§ 416.13(a)(1) (defining objective medical evidence as "signs, laboratory findings, or both"); 416.902(k) (defining signs as "one or more anatomical, physiological, or psychological abnormalities that can be observed" and psychiatric signs as

"medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception").

In evaluating NP Crespin's opinion, the ALJ did write that her "evaluation indicated some deficits in attention and concentration and circumstantial thought processes." (AR 29.) However, as Claimant contends, the ALJ did so solely to compare this evidence to other evidence in the record, thus addressing consistency rather than supportability. *See Acosta Cuevas v. Comm'r of Soc. Sec.*, Civ. No. 20-502 AJN/KHP, 2021 WL 363682, at \*14 (S.D.N.Y. Jan. 29, 2021) ("[T]he ALJ discussed some of the objective medical evidence in the record in comparison to the CE's opinions to determine if the evidence and opinions were consistent, which is what the consistency, not supportability factor[], calls for."). Moreover, the ALJ did not discuss whether the history, diagnoses, and other abnormal findings in the report, including "average/below average" intellect and "[i]mpaired" insight, support NP Crespin's opinion. Indeed, the ALJ's ruling lacks any discussion at all of how well NP Crespin's report supports her opinion.[16]

In short, the ALJ did not adequately articulate how he considered the supportability of NP Crespin's opinion. *See Zambrano*, 2022 WL 1746765, at \*6 (noting that "[t]he supportability factor examines how well a medical source supported his own opinions with objective medical evidence and supporting explanations") (quotation marks omitted). An ALJ's failure to adequately articulate his analysis of the supportability factor "effectively hinders the Court's ability to determine whether substantial evidence supports his persuasiveness analysis" and necessitates remand. *Id.* at \*7; *cf. Summers v. Soc. Sec. Admin.*, Civ. No. 14-936 KG-LF, 2016 WL 10538644, at \*8 (D.N.M.

---

[16] Nor does the ALJ's discussion of NP Crespin's report at step three supply the missing articulation of a supportability analysis. (*See* AR 22.) At step three, as at step four, the ALJ mentioned NP Crespin's finding of impaired concentration only to compare it to other evidence in the record, and did not discuss whether it supported her opinion. (*Id.*)

Mar. 22, 2016) (concluding an ALJ's failure to sufficiently discuss supportability factor constituted grounds for remand under regulations in effect before March 27, 2017).

### 3. Consistency

Lastly, Claimant contends the ALJ failed to properly analyze the consistency of NP Crespin's opinion with other evidence in the record. (Doc. 16 at 17.) Specifically, Claimant argues the ALJ improperly "pick[ed] and chose amongst the evidence" to support his erroneous conclusion that NP Crespin's opinion was inconsistent with the longitudinal evidence. (*Id*. at 18.) Additionally, Claimant asserts the ALJ erred by finding NP Crespin's opinion to be inconsistent with his activities of daily living. (*Id*. at 18.) On this point, Claimant claims the ALJ ignored significantly probative evidence consistent with NP Crespin's opinion, which shows that he struggles to perform the activities of daily living on which the ALJ relied. (*Id*. at 18–19.)

The Commissioner, on the other hand, submits that Claimant's "argument about the ALJ's interpretation of [NP] Crespin's examination findings goes to the weight of the evidence, which cannot be reweighed." (Doc. 19 at 15 (citing *Olson v. Comm'r, SSA*, 843 F. App'x 93, 97 (10th Cir. 2021)).) Further, the Commissioner contends the evidence establishes that NP Crespin's opinion was in fact inconsistent with other medical evidence in the record, and that the "ALJ reasonably found [NP] Crespin's opinion inconsistent with [Claimant's] daily activities of working part-time, where he did bookkeeping, ran errands, and cared for young children, and his abilities to drive and spend time with friends." (*Id*. at 16 (citing AR 29).) The Commissioner believes "the Court should decline to reweigh the evidence that [Claimant] presents as showing he cannot maintain competitive employment, had issues driving, and did not visit friends." *(Id*. at 17.)

In finding NP Crespin's opinion inconsistent with the longitudinal medical evidence of record, the ALJ wrote that "while the consultative evaluation indicated some deficits in attention

and concentration and circumstantial thought processes, these findings were not consistently indicated in the claimant's actual treatment records." (AR 29.) The ALJ added that "[t]he longitudinal evidence with treating providers, relevant to the period at issue, indicates some anxiousness and fluctuations in his mood, but also him being alert, oriented, having intact memory, normal thought content, and predominantly normal thought processes." (*Id.*)

The ALJ's reasoning on this point is not clear enough for a reasonable adjudicator to follow. It is incumbent upon an ALJ to "build an accurate and logical bridge from the evidence to his conclusion." *Monroe v. Colvin,* 826 F.3d 176, 189 (4th Cir. 2016) (citation omitted). But the ALJ failed to do so here. For example, the ALJ found, in part, that NP Crespin's opinion was inconsistent with the longitudinal evidence because some treatment notes in the record documented Claimant as being "alert" and "oriented." (AR 29.) However, a person can be alert and oriented and also have impaired attention and concentration, as indeed NP Crespin found in her evaluation of Claimant. (AR 1002-03.) The former conditions do not negate the latter. "Alertness" refers to "the level of [one's] consciousness," *e.g.*, whether one is "awake and responsive" or "in a stupor or in a coma," and "[o]rientation" refers to one's "awareness of [one's] situation and surroundings." Cleveland Clinic, *Mental Status Exam*, https://my.clevelandclinic.org/health/diagnostics/mental-status-exam (last visited January 26, 2026); *see also Ronald L. v. Kijakazi*, Civ. No. 22-3090 EFS, 2023 WL 4494178, at *4 (E.D. Wash. July 12, 2023) (noting that a finding that an individual is oriented "indicate[s] only that [he] was adequately aware of his situation and surroundings (oriented to time, place, person, and situation.")). "Attention and concentration," in contrast, refer to how well one "stay[s] focused" on questions or tasks. Cleveland Clinic, *Mental Status Exam*, *supra.* Plainly, one can be awake, responsive, and aware of one's situation and surroundings yet unable to stay focused on questions or tasks. One can also be

alert and oriented in this sense and yet be severely limited in one's ability to work without supervision, as NP Crespin found Claimant to be. Thus, absent further explanation, treatments records documenting Claimant as being alert and oriented do not support the ALJ's conclusion that these records are inconsistent with NP Crespin's opinion.

Likewise, treatment records documenting that Claimant had an "intact memory" do not appear to conflict with NP Crespin's opinion that Claimant is moderately to severely limited in his abilities to attend and concentrate and severely limited in his ability to work without supervision. In the context of a MSE, attention and concentration, on the one hand, and memory, on the other, are distinct categories of cognition. Cleveland Clinic, *Mental Status Exam*, *supra*. As just noted, "attention and concentration" refer to how well one stays focused on questions or tasks. *Id.* Memory, in contrast, may be tested in "various forms … including immediate recall, recent memory and long-term memory." *Id.* Logically, one can be impaired in one of these areas but not the other. And one can certainly have intact memory but struggle to work without supervision. Thus, again, absent further explanation, treatments records documenting Claimant as having an intact memory do not support the ALJ's conclusion that these records are inconsistent with NP Crespin's opinion.

Nor do treatment notes documenting Claimant as having a "normal thought content" and "predominantly normal thought processes" appear to undermine NP Crespin's finding of impairments in his attention, concentration, and ability to work without supervision. Treatment notes discussing an individual's thought content normally "refer[] to whether the person exhibits any suicidal ideations, homicidal ideations, or delusions." *Ronald L.*, 2023 WL 4494178, at *5. It is not at all evident, and the ALJ's decision does not explain, how a finding that an individual is not suicidal, homicidal, or delusional necessarily negates a finding that his abilities to attend,

concentrate, and work without supervision are impaired. Moreover, when treatment notes refer to an individual having "normal thought processes," this generally means that the individual's thought process is "linear and goal-directed." *Id*. (citation omitted). Again, it is unclear, and the ALJ's reasoning does not explain, how it is inconsistent for an individual to have both a linear, goal-directed thought process and impairments in attention and concentration.

I am aware that elsewhere in his decision, the ALJ noted that Claimant's "mental status examinations often indicated findings of … normal attention and concentration," which could be construed as inconsistent with NP Crespin's opinion. (AR 26-27; *see also* AR 22, 25.) Importantly, however, the ALJ did not mention this as a reason to reject NP Crespin's opinion. (AR 29.) Moreover, the findings of normal attention and concentration in the record are not necessarily in conflict with NP Crespin's opinion, for three reasons. First, any given mental status evaluation is simply a "snapshot in time," *i.e.*, a single data point documenting how the individual is functioning at a particular point in time and is therefore subject to variation. *Halee L. J. v. Comm'r of Soc. Sec.*, Civ. No. 25-509 BAT, 2025 WL 2753611, at *3 (W.D. Wash. Sept. 29, 2025); *Cruz*, 2022 WL 970153, at *5. Second, some of the record findings of normal attention and concentration were made in 2007, well outside the relevant time period. (*See, e.g.*, AR 417, 419, 421, 423; *but see* AR 460-61 (consultative examination by Charles D. Mellon, M.D., on September 24, 2008, finding that Claimant had a "[m]arkedly limited" ability to attend and concentrate).) And third, in contrast to NP Crespin's findings, even those findings of normal attention and concentration made within the relevant time period were not based on objective testing. Rather, they appear to have been based merely on Claimant's counselor's routine and repetitive observation that Claimant could "direct attention" and "read" at therapy sessions. (*See, e.g.*, AR 553-54, 556-57, 559-60, 562-63, 565-56, 569-70.) Of course, neither a consultative examination nor a routine counseling session is

likely to be as stressful as a workplace. *See, e.g.*, *Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1107 (11th Cir. 2021) (noting "the fundamental differences between the relaxed, controlled setting of a medical clinic and the more stressful environment of the workplace"), *superseded by regulation on other grounds as stated in Glover v. Comm'r, Soc. Sec. Admin*., No. 22-10497, 2022 WL 17826364, at *3 (11th Cir. Dec. 21, 2022); *Morales v. Apfel*, 225 F.3d 310, 319 (3rd Cir. 2000) (noting that "the work environment is completely different from a home or mental health clinic"). But objective testing at a consultative examination certainly seems more likely than routine observation during therapy sessions to approximate an individual's abilities and limitations in the more stressful workplace environment. Thus, absent any mention or discussion of findings of normal attention and concentration in the ALJ's assessment of NP Crespin's opinion, it is not possible to simply assume that the ALJ rejected the opinion due to these findings.

In addition, as Claimant argues, I have concerns that in relying on Claimant's treatment notes in his consistency analysis, the ALJ impermissibly cherry-picked evidence and ignored evidence that was consistent with NP Crespin's opinion. It is well-established that an ALJ "may not pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence," *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004), and must "discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton*, 79 F.3d at 1009–10. Here, in rejecting NP Crespin's opinion, the ALJ did not acknowledge any consistencies it shared with Dr. Wewerka's opinion, even though he specifically found these two opinions to be consistent when he assessed Dr. Wewerka's opinion. (AR 27.) This omission is particularly troubling for two reasons.

First, though the ALJ rejected NP Crespin's opinion, he found Dr. Wewerka's opinion to be "generally persuasive." (*Id*.) Second, Dr. Wewerka opined that Claimant had a moderate mental

limitation in his ability to maintain attention and concentration for extended periods, (AR 91), which in fact largely aligns with the portion of NP Crespin's opinion that the ALJ specifically called into question. In addition, Dr. Wewerka opined that Claimant had moderate mental limitations in his abilities to interact with the general public and his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*) Similarly, NP Crespin opined that Claimant had moderate limitations in his abilities to interact with the public and to interact with peers at work. (AR 1004.) Thus, the ALJ's analysis runs afoul of the well-established rule that an ALJ cannot simply ignore significantly probative evidence favorable to the claimant. *Clifton*, 79 F.3d at 1009–10.

Moreover, in rejecting NP Crespin's opinion, the ALJ failed to discuss treatment notes documenting Claimant's frequent complaints of concentration issues. For example, treatment notes from SW Care Center, where Claimant was seen from December 2021 to June 2022 and from December 2022 to May 2023, document that he frequently reported experiencing concentration problems. (AR 648, 654, 660, 666, 672, 678, 692, 698, 706, 1027, 1033, 1040, 1047, 1055, 1061.) These treatments notes are particularly relevant because they were created close to or during the relevant time period. *See* 20 C.F.R. § 416.912(3)(b)(1) ("[W]e will develop your complete medical history for at least the 12 months preceding the month in which you file your application."). While an ALJ may permissibly reject a claimant's self-reported symptoms contained in medical records, he should, at the very least, explain why he has done so. By failing to discuss these treatment records in analyzing the consistency of NP Crespin's opinion, the ALJ impermissibly picked and chose "among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Hardman*, 362 F.3d at 681.

The ALJ also determined that NP Crespin's opinion was inconsistent with Claimant's activities of daily living, which, according to the ALJ, "require a greater level of function than [her] opinion seemingly allows." (AR 29.) Specifically, the ALJ wrote that Claimant "acknowledged working part-time and engaging in activities that include bookkeeping, running errands, and caring for young children," as well as "having a driver's license, being capable of driving a car, and spending time with friends." (*Id*.) But this reasoning is problematic for two reasons.

First, the ALJ's characterization of the evidence regarding Claimant's activities of daily living is misleading. For example, although Claimant does have a history of working part-time, the ALJ did not acknowledge the uncontroverted evidence that Claimant has failed to do so successfully. For example, Claimant's manager observed that while he was working part-time at Twisters, he "messed up orders and got overly frustrated with it." (AR 409.) Also, Claimant reported that he was fired from Twisters for getting into a "fight with his supervisor." (AR 916.) Further, while Claimant currently works part-time for his mother's business, his mother testified that he requires accommodations a disinterested supervisor would likely be unwilling to tolerate. (AR 67-70.) In these respects, the ALJ's reasoning mischaracterizes the evidence and fails to account for "the specific facts regarding what Claimant reported being able to do." *Stingley v. King*, Civ. No. 24-73 JCH/KK, 2025 WL 428574, at *12 (D.N.M. Feb. 7, 2025).

Second, a claimant's intermittent performance of activities of daily living is not necessarily inconsistent with a medical opinion that the claimant's work-related abilities are impaired. *See Thompson v. Sulivan,* 987 F.2d 1482, 1490 (10th Cir. 1993) ("The sporadic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity.") (brackets and citation omitted); *see also Talbot v. Heckler*, 814 F.2d 1456, 1462–

63 (10th Cir. 1987) ("Ability to drive an automobile, participate in some community affairs, attend school, or to do some work on an intermittent basis does not necessarily establish that a person is able to engage in 'substantial gainful activity…'" (citation omitted)); *Maldonado*, 2022 WL 7009784, at *12 ("[T]he Tenth Circuit has held that an ALJ's reliance on sporadic and intermittent performance of daily activities to establish that a claimant is capable of engaging in substantial gainful activity is insufficient when a claimant's medical complaints are supported by substantial evidence." (citing *Frey v. Bowen*, 816 F.2d 508, 516–17 (10th Cir. 1987)). As the Eleventh Circuit has explained,

> it goes almost without saying that many people living with severe mental illness are still capable of eating, putting on clothes in the morning, and purchasing basic necessities. None of these activities, however, say much about whether a person can function in a work environment—with all of its pressures and obligations—on a sustained basis.

*Simon*, 7 F.4th at 1108. Here, the fact that Claimant can drive a car, sometimes work for his mother's business and help her care for her grandchildren, and sometimes spend time with friends is not, absent further explanation, inconsistent with NP Crespin's opinion.

Of course, ALJs need not achieve "technical perfection" in their decisions; rather, their reasoning must simply be clear enough to follow and to allow the Court to ascertain that correct legal standards have been applied. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). Nevertheless, here, the ALJ's consistency analysis fails to satisfy this relatively forgiving standard. I therefore conclude that the ALJ did not adequately articulate his analysis of the consistency factor in evaluating NP Crespin's opinion.

For all of these reasons, I find that the ALJ erred in his evaluation of NP Crespin's opinion and recommend that the Court remand on this basis.

CONCLUSION

I recommend that Claimant's Motion (Doc. 16) be GRANTED, and that the Commissioner's decision denying Claimant's Supplemental Security Income claim be REVERSED and this matter REMANDED to the Commissioner for further proceedings in accordance with this PFRD.

**Timely objections may be made pursuant to 28 U.S.C. § 636(b)(1)(C). Within fourteen (14) days after a party is served with a copy of these proposed findings and recommended disposition that party may, pursuant to Section 636(b)(1)(C), file written objections to such proposed findings and recommended disposition with the Clerk of the United States District Court for the District of New Mexico. A party must file any objections within the fourteen-day period allowed if that party wants appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

38